IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v.                             ) | Criminal No. 05-31 Erie |
| ) | |
| WARREN THOMAS FAHEY, JR.    ) | |

## OPINION

Defendant Warren Thomas Fahey, Jr. is charged with one count of making counterfeit obligations or securities of the United States, in violation of 18 U.S.C. § 471. He attempted to pass a counterfeit $100 bill at an Erie gas station. He entered a plea of not guilty on August 1, 2005.

On October 4, 2006, the undersigned heard oral argument on Defendant's motion to suppress statements he made to law enforcement, and the evidence that flowed from these statements. Defendant was represented by Thomas Patton, Assistant Federal Public Defender. The government was represented by Assistant United States Attorney Marshall Piccinini. The government presented the testimony of Secret Service Agent Keith Hiner, and the Defendant testified on his own behalf.

Following the hearing, the Court took the motion under advisement.

Having now considered the testimony along with the submissions of the parties and the applicable law, for the reasons set forth below we will deny this motion.

## I. BACKGROUND

These charges arose from Defendant's attempt to pass a counterfeit $100 federal reserve note at the Sunoco Food Mart, 26 E. 12th Street, in Erie, Pennsylvania, on April 4, 2005. When the clerk did not accept the bill, Fahey grabbed the bill and left the store.

Erie police responding to the scene saw an individual matching the description given by the store clerk. That individual, who was the Defendant, saw the police and ran into a nearby business, Labor Ready, where he locked himself in the bathroom. Officers could hear the

sound of flushing through the door.

Police officers detained Fahey after he exited the bathroom. He was taken to the Sunoco station where the clerk identified him as the man who had attempted to pass the bill.

**First interview (April 4, 2005)**

After he was identified, Fahey was taken to the Erie Police Station, where he was interviewed by Lieutenant Joe Kress and United States Secret Service Agent Keith Hiner. The parties dispute what occurred during this interview: Defendant asserts that Kress told him that if he admitted to the offense he wouldn't do any jail time but that if he continued to deny it "things would get done the hard way." The government denies that any such statement was made.

Agent Hiner testified at the suppression hearing that he was in charge of the investigation, and thus he controlled the interview with Fahey. He and Kress went into the interview room together, and Kress was never alone in the room with the defendant. There was no "good cop bad cop" routine. Hiner testified that Kress never made any promises or threats to the Defendant in his presence.

Prior to being interviewed, Agent Hiner read Fahey his *Miranda* rights. Hiner testified that he explained the top half of the form and read it aloud, and then read the bottom part of the form which is the waiver. Fahey stated that he understood. Hiner had the Defendant read aloud the sentence stating that "I have read this statement of my rights and it has been read to me, and I understand what my rights are." Fahey never told Hiner that Kress had said anything to him, or that he had made any promises. Fahey signed the waiver form. (Pl.'s Ex. 1). Hiner testified that there was no evidence that the Defendant was mentally ill, or that he had a low IQ. Nor was there any indication that he didn't understand the form he signed. It is undisputed that the Defendant can read. (Fahey T. at 16).

Fahey did not want to discuss what he'd been arrested for, but he told the officers that he owned several computers, a scanner, and a printer, which he kept in his bedroom at his

2

parents' house. Fahey said that he owned seven or eight computers and that his parents did not own any; any computer in the house belonged to him. He said that he was interested in pornography, and wanted to direct pornographic films. He chatted online with women who might be potential models for his films.

When the agents asked if a search of his computers would show that he'd attempted to produce counterfeit bills, he replied "probably."

Fahey signed two consent to search forms, consenting to a search of his parents' home and all of the computers found during that search. (Def.'s Ex. 2, 3). Fahey denied owning any vehicles. Hiner read the consent forms aloud to Fahey before he signed them. No threats were made, and Fahey didn't say that any promises had been made. Fahey said that there would be images of federal reserve notes on the hard drive of his computers, as well as images of adult and child pornography.

Fahey also testified at the suppression hearing. He is thirty-five years old, and receives Social Security disability income for a mental disability; he lives at home with his parents. (Fahey T. at 4).

A psychological evaluation of the Defendant prepared on May 20, 2006, shows that the Defendant has long suffered from mental illness. (Def.'s Ex. A). He dropped out of school in the 9th grade and has an IQ of 76, which places him on the borderline of mental retardation. The psychological evaluation noted that he responded selectively to various personality measurements. Despite evincing "significant psychological disturbance," he was competent to understand the nature and consequences of the proceedings against him, and was able to review the events of his arrest with the psychologist and to identify his legal rights. (Def.'s Ex. A at 6). The psychologist stated that "Mr. Fahey is a verbal communicator, though was clearly marginally resistant to responding to direct questions. . . . He was clearly evasive at times in responding and demonstrated elements of delusional thinking." (Def.'s Ex. A at 2). Diagnosis was consistent with paranoid schizophrenia. (Def.'s Ex. A at 5).

After being identified and taken to the police station on April 4, Fahey was kept in a holding cell for approximately two hours until the agents arrived at about 12:30 p.m. During that time, he had no communication with any police officers. (Fahey T. at 5). He wanted to make a phone call. (*Id.* at 5). Kress accompanied him from the holding cell to the interview room for questioning. (*Id.* at 5-6). While they waited for Agent Hiner at a table in the hallway outside the interview room, Kress did not discuss the questioning, and did not say that it would be in Defendant's best interests to talk. (*Id.* at 6).

Fahey denies being read his *Miranda* rights. He stated that "[h]e [Agent Hiner] read something but – he didn't read it in its entirety. This part you have the right to talk to a lawyer for advice before questioning and to have him with you during questioning." Defendant said that this had not been read, but that he was shown the form to read for himself before the officers asked him any questions. (*Id.* at 7-8).

During the June 4 interview, Fahey initially denied passing a counterfeit bill. He testified that Kress "had told me – at different points, he says you can make this something like – he said something like you can make this easy, you can talk and give us the information, you won't get no jail time. Then after that didn't work, he said if you want to get a hard case, we can do things the hard way. Make things hard for you." (*Id.* at 8, l. 12-17). Fahey said he believed that the officers would "put things on the report that weren't true, maybe resort to some sort of violence." (*Id.* at 8, l. 24-25). He had previously been arrested and convicted on charges of criminal trespass, disorderly conduct, simple assault, driving under the influence, harassment, and receiving stolen property. (Pl.'s Ex. 9, 10). He thought that the police had said things about him in the past that weren't true. (*Id.* at 9). He admitted that Kress did not tell him they were going to put lies in his report. (*Id.* at 12-13). He testified that he wasn't sure if Kress could have some input on whether or not he went to jail. (*Id.* at 10). He also stated that Kress's statements only "somewhat" influenced his decision to admit to counterfeiting activity. (*Id.* at 11). Kress mentioned a search warrant, and Fahey thought the officers would "end up

going to my house and finding evidence anyhow." (*Id.* at 11).

On cross-examination, Fahey acknowledged that from his prior criminal history he knew that a judge would be the one to decide whether he went to jail or not. (*Id.* at 14-15. He admitted that he had signed documents during the questioning, and that the signature on them was "probably" his, but he could not say that he had signed the exact waivers previously introduced into evidence. (*Id.* at 17-18).

The officers questioned Fahey for approximately one hour, and left him at the police station for processing.

**Consent search of Fahey's parents' residence**

Pursuant to the consent forms Fahey signed, officers searched his parents' residence that same day. His mother consented to the search. During the search of Fahey's bedroom, several computers and an all-in-one copier-scanner-printer were seized. Located on the glass bed of the copier-scanner-printer were the remnants of tape in the outline of an item of United States currency. Pornography and emails on the primary computer corroborated what Fahey had told the officers.

The officers saw a receipt for the trailer in Fahey's name during their search of his bedroom, and asked his mother if this was his vehicle. (Pl.'s Ex. 4). They also found a Pennsylvania registration renewal form for a 1991 Chevrolet in the name of Warren T. Fahey, Jr. Although the Defendant had denied having any vehicles, Fahey's mother told the investigators that their son spent a lot of time in a 1982 Sportsman RV trailer parked in the back yard of their residence, and that he was the registered owner of a 1991 Chevrolet Beretta which was also parked there. He used his computers in his bedroom because there was no internet access in the RV.

The officers had the vehicles sealed until they could obtain a search warrant.

**Second interview (April 5, 2005)**

Fahey was interviewed a second time the following day, April 5, 2005. This time,

Agent Hiner and Lt. Kress interrogated Fahey at the Erie County Prison, where he was being held on a probation detainer. He was advised of his *Miranda* rights and waived those rights in writing. (Pl.'s Ex. 5).

During this second interview, Fahey admitted to manufacturing over $1,000 in counterfeit U.S. currency, and said that on the previous day he had ten counterfeit $100 bills in his possession before his arrest. Fahey admitted to flushing the counterfeit bills down the toilet in the bathroom at Labor Ready, when the Erie police were following him. The officers asked about a counterfeit bill that had been passed in Union City, Pennsylvania, and Fahey admitted to that incident as well.

Fahey also admitted that the two vehicles were his. Fahey signed a consent form authorizing a search of the RV trailer and the Chevrolet Beretta, and agreed to give the officers keys. (Pl.'s Ex. 6). Although Fahey consented to the searches, investigators also obtained a federal search warrant for Fahey's two vehicles. (Pl.'s Ex. 7).

**Consent search of Fahey's vehicles**

With Fahey's consent and pursuant to a federal search warrant, agents searched Fahey's vehicles on April 5. In the trailer, Agent Hiner found sheets of counterfeit $20 bills and one counterfeit $100 bill. The serial number on the seized counterfeit $20 bills was identical to the serial number on a genuine $20 bill that was part of Fahey's personal property at the jail.

The officers obtained a federal warrant to search the contents of the seized computers. (Pl.'s Ex. 8).

## II. MOTION TO SUPPRESS

For a confession or inculpatory statement to be admissible, the government must establish that the statements were made voluntarily. Defendant argues that the statements he made to the authorities on April 4, 2005 were not voluntary, because he suffers from schizophrenia and his will was overborne by the officers' coercion and promises.

**Applicable Law**

6

An involuntary inculpatory statement cannot be introduced at trial. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

Courts have concluded that a confession is not involuntary unless it was the product of "police overreaching." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). The United States Supreme Court has advised that "[c]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause. . . ." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[T]he question in each case is whether the defendant's will was overborne at the time he confessed." *Hayes v. Washington*, 373 U.S. 503, 513 (1963).

Voluntariness is assessed by looking at the totality of the surrounding circumstances, including "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Factors to be considered include "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep." *Miller v. Fenton*, 796 F.2d 598, 608-12 (3d Cir. 1986). As part of the totality of the circumstances, the court must consider whether any promises were made to a defendant to induce an inculpatory statement. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986).

Where a defendant is mentally ill, the Supreme Court has cautioned that "a defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness'." *Connelly*, 479 U.S. at 167.

**Fahey's statements to law enforcement were voluntary**

Fahey argues that his statements on April 4, 2005 were not voluntary because he is a "seriously mentally ill man" who suffers from paranoid schizophrenia, and because Officer Kress told him that "we can do this the easy way or the hard way."

However, absent evidence of police coercion, a defendant's mental illness does not

7

establish that a statement was not voluntarily given, and the circumstances surrounding the questioning on April 4 fail to show coercion or police trickery so as to make Fahey's statements involuntary. At the age of thirty-four the Defendant was not a young man, and he had extensive experience with the criminal justice system prior to being arrested on these charges. The first interrogation at the police station was not lengthy; it lasted only one hour. Fahey was not questioned repeatedly over a long period of time, and there is absolutely no evidence that he was deprived of food or sleep or that the interrogation was in any way coercive.

Nor does Defendant's assertion that Kress told him that "we can do this the easy way or the hard way" show that he made statements involuntarily. We find Agent Hiner's testimony that Kress did not make such a statement credible. Moreover, we find that the Defendant's own testimony on the matter was not fully credible.

Fahey himself testified that he and Kress waited a few moments in the hallway for Agent Hiner, and that Kress neither discussed the nature of the questions he would be asked nor said that they could do this the easy way or the hard way before Hiner arrived. Both men were with him in the interview room; Kress was not alone with the Defendant after the questioning began. Hiner's testimony that Kress did not make the alleged statements in his presence is credible, and Defendant's testimony that he was told during this interview that the police would go easy on him and keep him out of jail if he confessed or signed the consent to search forms is not believable.

Furthermore, before the questioning started, and before Fahey told the officers that if they searched his computer they would "probably" find an indication of counterfeiting, Hiner read him the standard form and Fahey signed a waiver of his *Miranda* rights. We do not find Fahey's testimony that Hiner only read part of the form to him and that he didn't know that it included his right to counsel to be credible. His testimony that he signed some documents at the time but couldn't say if it was his signature on the forms submitted into evidence is equally

8

unpersuasive. Despite his mental health history, his psychological evaluation indicates that he was competent, and able to understand his legal rights, and there was nothing in his testimony or demeanor at the suppression hearing to suggest otherwise. We are satisfied that Fahey signed a valid waiver of his *Miranda* rights before he was interviewed on April 4, and that he was not deceived or tricked into doing so.

As we have stated, we find Agent Hiner's testimony that Kress did not make any threatening statements in his presence credible, and the Defendant's assertions to the contrary are not credible. However, we conclude that even if Kress did tell Fahey that "we could do this the easy way or the hard way," such a statement does not rise to the level of coercion that results in a defendant's will being overborne. On direct examination, the Defendant said that Kress's statements only "somewhat" influenced his decision to talk about the counterfeiting. (Def.'s T. at 11 l. 16). And on cross-examination, Fahey explained that he made the statements and consented to the searches at least partially because he thought the officers would find the evidence anyway: (*Id*. at 13-14).

> A. He [Kress] said some words along the lines – a few different times during the questioning, we can do this the easy way and you won't get no time in jail. And other times he said if you want to be a hard case, we can make things hard for you, we get harder cases than you.
>
> Q. And as far as being done the hard way, didn't you indicate that what you took that to mean was that they could go get a search warrant and end up finding stuff at your house anyway, so that's why you talked – so whether you talked or not, you knew they were going to find the evidence against you, didn't you?
>
> A. Basically, yeah.
>
> * * *
>
> Q. When [your attorney] asked you, didn't what Mr. Kress say influence what you said, you did indicate that it somewhat influenced you, but you said they'd end

9

>    up going to my house and finding the evidence anyway, that's what you testified to?
>
> A.   I did say that and I said it was partially the reason.

*(Id.* at 13, l. 5- 16; 14, l. 9-13).

Fahey's testimony that he made incriminating statements and consented to the searches of his bedroom and computers only "partially" because of Kress's alleged statements but also because he believed the authorities would get a search warrant and find the evidence of counterfeiting anyway, belies his argument that his will was overborne by coercive police tactics. He was not tricked into making a confession, or into signing the consent to search forms, by false promises. By his own testimony, he thought that the police would discover the evidence regardless of what he did or said. Moreover, he knew from his prior criminal history that the sentencing judge, and not the police, would decide whether he would go to jail. *(Id.* at 14-15).

Indeed, considering the totality of the circumstances, we find no evidence that Fahey made incriminating statements because his will was overborne. Nor did he sign the forms giving the officers consent to search his bedroom and his computers involuntarily. The government has met its burden of proving that Fahey's statements and consent to the searches were voluntarily given, and therefore the fruits of those searches need not be suppressed. The second interview, on April 5, was also preceded by a signed waiver of Fahey's *Miranda* rights. Accordingly, we further conclude that the inculpatory statements made during that interview were voluntary, and that the items recovered from his computers and vehicles pursuant to both his consent and a federal search warrant need not be suppressed.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress will be denied. An appropriate Order follows.

November 15, 2006
Date

Maurice B. Cohill, Jr.
Senior United States District Judge